## THE STATE v. HEGER, Appellant.

### Division Two, March 29, 1906.

1. **WILD GAME: Ownership: Police Power.** The absolute ownership of wild game is vested in the people of the State, and the Legislature, as the representative of the people, may grant to individuals the right to hunt, and kill game at such times and upon such terms and under such restrictions, as it may see proper, or prohibit it altogether, as the Legislature may deem best. The regulation of such a matter falls within the police power of the State.

2. ———: **Shipped into This State: Interstate Commerce.** Even though a shipment into this State of game taken in another State constitute interstate commerce, yet such game becomes subject to the game laws of this State under the Act of Congress of May 25, 1900, which provides that wild game "transported into any State or Territory, or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers," etc.

3. **GAME LAW OF 1905: Selling Game: Section 18 Constitutional.** Section 18 of the Game Law of 1905 (Laws 1905, p. 158), prohibiting the selling, within this State, at any time of the year, of any of the game protected by the act, whether taken within or without this State, or lawfully or unlawfully taken, is not in conflict with any provision of either the State or the Federal Constitution, but is a valid and constitutional enactment.

Appeal from St. Louis Court of Criminal Correction.—
*Hon. C. Orrick Bishop,* Judge.

AFFIRMED.

*Morton Jourdan* and *Frank H. Farris* for appellant.

Under the agreed statement of facts, it is shown that one bird was killed in the State of Missouri, in open season, and purchased and came into the posses-

sion of defendant in the open season; that the other bird was killed in the Territory of Oklahoma, and the duck in the State of Texas, and the second duck in the State of Arkansas, during the open seasons in said States and Territory, as provided by the law of said States and Territory, and that they were purchased by the defendant during said open seasons. This being true, they were lawfully in his possession, and the Legislature could not authorize their confiscation and destruction, and could not make this defendant liable, because said birds were in his possession when the act went into effect, nor could it impose criminal liability upon defendant because when the act went into effect he did not destroy or had not prior thereto sold and disposed of said property.

*Herbert S. Hadley,* Attorney-General, *John Kennish,* Assistant Attorney-General, and *Charles E. Yeater* for the State.

(1) There is primarily no private right of ownership in wild game, and the absolute ownership of the same is vested in all the people in their collective sovereign capacity as constituted into the State, and the wild game is not the subject of private ownership, except in so far as the people, through the lawmaking power of the State, elect to so make it, and the State may absolutely prohibit the taking of it, or any traffic or commerce in it, or may permit its taking it under a qualified ownership subject to any conditions it sees fit to impose if deemed necessary, for its protection or preservation, or the public good. Geer v. State of Connecticut, 161 U. S. 519; Haggerty v. Ice Mfg. & Storage Co., 143 Mo. 238; American Express Co. v. People, 133 Ill. 649. (2) The Game Law of March 10, 1905, is not in violation of section 8 of article 1 of the Constitution of the United States, providing that the Congress shall have power to regulate commerce among the several

States, as interpreted by the appellate courts of this
State. State v. Randolph, 1 Mo. App. 15; State v. Judy,
7 Mo. App. 524; State v. Farrell, 23 Mo. App. 176; Hag-
gerty v. Ice Mfg. & Storage Co., 143 Mo. 246. And
it is so held in other jurisdictions. In re Deininger,
108 Fed. 623; Ex parte Maier, 103 Cal. 476; Magner
v. People, 97 Ill. 320; Merritt v. People, 169 Ill. 218;
Stevens v. State, 89 Md. 669; Commonwealth v. Savage
(Mass.), 29 N. E. 468; People v. O'Neil, 110 Mich.
324; Roth v. State, 51 Ohio 209. (3) The game birds
described in the agreed statement became subject to the
game law of the State at the time they passed the State
line on their shipment therein. United States Com-
piled Statutes 1901, p. 3181; In re Rahrer, 140 U. S.
545.

BURGESS, P. J.—This is a prosecution upon an
information filed against the defendant for a violation
of section 18 of the Act of March 10, 1905, for the pre-
servation of game and fish. The information was filed
in the court of criminal correction of the city of St.
Louis, on June 30, 1905, and charges that the defendant,
Fred Heger, on June 27, 1905, did willfully and unlaw-
fully sell to one H. W. Kuehans, in the city of St.
Louis, Missouri, certain game birds, to-wit, one quail,
one grouse, one teal duck and one mallard duck, which
said birds had been killed without the State of Mis-
souri, and shipped into said State, and were then and
there in possession of the said defendant, contrary, etc.

On August 12, 1905, the cause was duly tried by
the court, a jury having been waived, upon an agreed
written statement of facts, there being no dispute as
to the facts relative to the sale of the game in ques-
tion. Such agreed statement of facts showed that the
defendant, at and in the city of St. Louis, in the State
of Missouri, on the 27th day of June, 1905, willfully had
in his possession the game birds described in the in-
formation, to-wit, one quail, commonly called a part-

ridge, one grouse, commonly known as prairie chicken, one teal duck, one mallard duck, and that on said day he sold to one H. W. Kuehans, in said city, all of said game birds. That the quail was killed in the State of Missouri, during the open season, as provided by law, and purchased during said open season by defendant; that the grouse was killed in the Territory of Oklahoma; that the teal duck was killed in the State of Texas, and that the mallard duck was killed in the State of Arkansas; that the said game birds were killed during the open seasons in said States and Territory, respectively, as provided by the laws of said States and Territory, and purchased by defendant and shipped to him during said open seasons, and that after the said purchases, and during all the time up to the date of sale, all of said birds had been placed and held in cold storage by defendant in the city of St. Louis in the State of Missouri. Under the finding and judgment of the court the defendant was found guilty, the court having refused defendant's instruction in the nature of a demurrer to the evidence; and thereafter, upon the same day, the defendant duly filed his motion for new trial and in arrest of judgment, which were by the court overruled. Defendant appeals to this court.

While it is said for defendant that the act in question is unconstitutional and void for several reasons, the only constitutional questions presented by this appeal are raised in the motion in arrest, and are as follows:

"Because the law under which defendant was arrested, tried and convicted, is in violation of section 1, article 5, of amendments to the Constitution of the United States, and sections 2, 15, 20 and 30, article 2, of the Constitution of the State of Missouri.

"Because the law under which the defendant was arrested, tried and convicted, is in violation of section 8, article 1, of the Constitution of the United States, in which impost or restriction upon interstate commerce

and dealings between citizens of the different States or foreign countries, is prohibited."

The authorities are uniform in holding that the absolute ownership of wild game is vested in the people of the State, and that such is not the subject of private ownership. As no person has in such game any property rights to be affected, it follows that the Legislature, as the representative of the people of the State, and clothed by them with authority to make laws, may grant to individuals the right to hunt and kill game at such times, and upon such terms, and under such restrictions as it may see proper, or prohibit it altogether, as the Legislature may deem best. [Haggerty v. Ice Mfg. & Storage Co., 143 Mo. 238; Geer v. State of Connecticut, 161 U. S. 519; American Express Co. v. People, 133 Ill. 649; Ex parte Maier, 103 Cal. 476; State v. Rodman, 58 Minn. 393; Magner v. People, 97 Ill. 320; Phelps v. Racey, 60 N. Y. 10.]

As it is shown by the agreed statement of facts that defendant had in his possession, in the city of St. Louis, and sold to H. W. Kuehans on the 27th day of June, 1905, all of the game birds mentioned in the information, he was guilty of the violation of the law; it matters not that the birds, except the quail, were killed in, and shipped to defendant from, other States, unless it be shown that his constitutional rights are violated by the act in question. In the leading case upon this subject (Geer v. Connecticut, 161 U. S. 519), Mr. Justice WHITE, says:

"From the earliest traditions the right to reduce animals *ferae naturae* to possession has been subject to the control of the lawgiving power." In speaking of this power in Haggerty v. Ice Mfg. & Storage Co., supra, SHERWOOD, J., said: "The exercise of this power has been definitely traced back even as far as the time of Solon, who forbade the Athenians to kill game. And in France, as early as the Salic law, the right to reduce a part of the common property in game to possession

and consequent ownership was regulated by law. Such regulations prevailed in every country in continental Europe and in England. Treating of this subject, Blackstone says: 'There still remains another species of prerogative property, founded upon a very different principle from any that have been mentioned before; the property of such animals *ferae naturae,* as are known by the denomination of game, with the right of pursuing, taking and destroying them, which is vested in the king alone, and from him derived to such of his subjects as have received the grants of a chase, a park, a free warren or free fishery. . . . In the first place, then, we have already shown, and indeed it cannot be denied, that by the law of nature every man, from the prince to the peasant, has an equal right of pursuing and taking to his own use all such creatures as are *ferae naturae,* and, therefore, the property of nobody, but liable to be seized by the first occupant, and so held by the imperial law even so late as Justinian's time. . . . But it follows from the very end and constitution of society that this natural right, as well as many others belonging to a man as an individual, may be restrained by positive laws enacted for reasons of State or for the supposed benefit of the community.' [2 Bl. Com., 410.] This prerogative of the king as an attribute of government recognized and enforced by the common law of England by appropriate and oftentimes severe penalties and forfeitures, was vested in the colonial governments of this country, and when these governments threw off the yoke of the mother country, that right of sovereignty passed to and was vested in the respective States. This sovereign attribute and power as existent in the States of this Union has often been exercised by them by passage of laws in the most of these States for the protection and preservation of game; and it seems never to have been called in question. Numerous adjudications attest this fact. In such cases the common ownership of game,

which otherwise would remain in the body of the people, is lodged in the State to be exercised like all other governmental powers in the State in its sovereign capacity, to be exercised in trust for the benefit of the people and subject, of course, to such regulations and restrictions as the sovereign power may see fit to impose. Such regulations appropriately fall within the domain of the police power of the State.''

It is also claimed for defendant that the law in question violates the interstate commerce clause of the Federal Constitution, because a penalty has been imposed upon him for selling the three birds described in the information and agreed statement of facts as being lawfully killed in, and shipped to St. Louis from, Arkansas, Texas, and Oklahoma, respectively, and because section 18 of the Act of March 10, 1905, prescribes a fine for the selling of such game, whether taken within or without this State, or whether lawfully or unlawfully taken.

This question was before the court in the case of State v. Randolph, 1 Mo. App. 15, and it was held that a game law which prohibits the selling or keeping in one's possession of certain game, within a certain period of the year, is valid, even when applied to game imported from another State, and, in this application, it is not such a regulation of commerce as belongs exclusively to Congress. The same ruling, upon substantially the same state of facts, is announced in State v. Judy, 7 Mo. App. 524, and in State v. Farrell, 23 Mo. App. 176. The latter case was cited with approval in Haggerty v. Ice Mfg. & Storage Co., supra. There is some conflict, however, in the authorities upon this question. In Geer v. Connecticut, supra, it was held that a shipment of game, lawfully killed in that State, to a point beyond the limits of the State, in violation of the game law of the State, was not without the force of such statute upon the ground that the State law was a

violation of the interstate commerce clause of the Federal Constitution.

But even if it be conceded that there is a distinction between a shipment of game taken in this State to a point outside of this State, and a shipment of game taken in another State to a point in this State, and that in the latter case the consignor acquired a property interest in the game thus shipped, making it an article of interstate commerce, to regulate which the Legislature has no power, it will not be denied that the right to so regulate rests in Congress. By the interstate commerce clause of the Federal Constitution it is expressly provided that Congress shall have power . . . to regulate commerce . . . among the several States; so that whatever doubt may have existed as to which tribunal, the Congress of the United States or the Legislature of this State, has the power and authority to regulate or prohibit the keeping and selling of game taken in another State and shipped to a point in this State, is put to rest by section 5 of the Act of Congress, entitled "An Act to Enlarge the Powers of the Department of Agriculture, prohibit the transportation of Interstate Commerce of Game killed in violation of Local Laws, and for other Purposes," passed May 25, 1900, which reads as follows:

"That all dead bodies, or parts thereof, of any foreign game animals, or game or song birds, the importation of which is prohibited, or the dead bodies, or parts thereof, of any wild game animals, or game or song birds, transported into any State or Territory, or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such animals or birds had been produced in such State or Territory, and shall not be exempt

therefrom by reason of being introduced therein in original packages or otherwise."

That act is substantially a reproduction of the Act of Congress of August 8, 1890, which is found in the United States Compiled Statutes of 1901, at page 3177, the only material difference being the substitution of "game" in the first-named act for "intoxicating liquors" in the latter. It is as follows:

"That all fermented, distilled or other intoxicating liquors or liquids transported into any State or Territory or remaining therein for use, consumption, sale or storage therein, shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent and in the same manner as though such liquids or liquors had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced therein in original packages or otherwise."

In In re Rahrer, 140 U. S. 545, it was held that this act is a valid and constitutional exercise of the Legislative powers conferred upon Congress, and that after that act took effect such liquors or liquids introduced into a State or Territory from another State, whether in original packages or otherwise, became subject to the operation of such of its then existing laws as had been properly enacted in the exercise of its police power.

We are unable to appreciate the position of defendant that the game law is in conflict with section 15, article 2, of the State Constitution, which prohibits the enactment of a law impairing the obligation of a contract, or of a law retrospective in its operation. The law is not obnoxious to either of these objections, for it does not impair the obligation of a contract, nor is it retrospective in its operation. It is simply a proper exercise of the police power of the State for the purpose of protecting its game, and preventing its exter-

mination, which would ultimately be the result in the absence of some such law.

There is no merit in the contention that the game law is in conflict with the fifth amendment to the Federal Constitution, which provides, among other things, that no person shall "be deprived of life, liberty or property without due process of law; nor shall private property be taken for public use without just compensation." Nor is the game law violative of sections 20 and 30 of article 2 of the State Constitution, which are in consonance with the above-recited provisions of the said fifth amendment to the Federal Constitution, as there is nothing in the law which tends to show, or from which it can be inferred, that the State is endeavoring to take the defendant's property for public use, or is attempting to deprive him of his liberty or property without due process of law. Section 2 of article 2 of the State Constitution has no application whatever to any issue involved in this case.

This prosecution is under section 18 of the game law, which provides that: "Any person, firm or corporation who shall at any time of the year barter, sell or offer for sale, in this State, either under the name used in this section or under any other name or guise whatever, any of the birds, game or fish protected in this act, whether taken within or without this State, or lawfully or unlawfully taken, shall be punished by a fine of not less than $50 nor more than $100 and cost of prosecution, and an additional fine of $5 for every bird, fish, animal or part of every bird, fish or animal sold or offered for sale."

That this section of the act is not in conflict with any provision of either the State or Federal Constitution is clearly shown by the authorities cited. Whether there is any other provision or section of this act invalid, because in conflict with the Constitution, we do not undertake to say, but even if there were, that would not affect the validity of said section 18. In 1 Lewis' Suth.

on Stat. Construction (2 Ed.), section 296, it is said: "Where a part only of a statute is unconstitutional, and therefore void, the remainder may still have effect under certain conditions. The court is not warranted in declaring the whole statute void unless all the provisions are connected in subject-matter, depend on each other, were designed to operate for the same purpose, or are otherwise so dependent in meaning that it cannot be presumed that the Legislature would have passed one without the other. The constitutional and unconstitutional provisions may even be expressed in the same section, or even in the same sentence, and yet be perfectly distinct and separable, so that the first may stand though the last fall. The point or test is not whether they are contained in the same section, for the distribution into sections is purely artificial, but whether they are essentially and inseparably connected in substance. If so connected the whole statute is void." [Grimes v. Eddy, 126 Mo. 168.]

Under the agreed statement of facts defendant was clearly guilty of the offense with which he is charged, and the trial court correctly so found. Finding no reversible error in the record, the judgment is affirmed.

All concur.